# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CAFFEINATE LABS, INC.,
                    Plaintiff


          v.


VANTE INC., a New York corporation, and
ALEXANDER SHLAFERMAN, an individual,
                    Defendants

Civil Action No._____


**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Caffeinate Labs, Inc. files this Complaint against Vante Inc. and Alexander Shlaferman (collectively "Defendants") for the foregoing reasons:

## PARTIES

1.       Plaintiff, Caffeinate Labs, Inc. ("Caffeinate") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its usual place of business at 170 Anderson Street, Portland, Maine 04101.

2.       Vante Inc. is a New York corporation organized and existing under the laws of New York, having a principal place of business at 1733 Sheepshead Bay Road, Suite 32, Brooklyn, NY 11235.

3.       Alexander Shlaferman, a/k/a Alex Xander, is an individual whose last known address is 134 Bay 26 Street, Brooklyn, New York 11214.

## JURISDICTION AND VENUE

4.       Plaintiff's claims arise out of patent infringement under Title 35 of the United States Code, unfair business practices under the Lanham Act, Title 15 of the United States Code,

and ancillary state law claims for unfair business practices, trade libel, interference with advantageous business relations, and unjust enrichment.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1338.  In addition, the Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Caffeinate and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00.  Finally, this court has ancillary jurisdiction over all state law causes of action pursuant to 28 U.S.C. § 1367.

6.      Venue is proper under 28 U.S.C. § 1391(b) and (c) and § 1400(b). Defendants have committed  acts giving rise to each of the claims raised in this complaint in this District. Defendants have regularly engaged in business in this Commonwealth and District and purposefully availed themselves of the privilege of conducting business in this District.

7.      Since learning about Plaintiff's innovative and patented designs on or about January 28, 2013, Defendants have been engaged in a scheme to willfully and knowingly misappropriate the designs and features of Plaintiff's patented works by developing a competing product, which is of like design, purpose and function.  Defendants' competing product is sold under the name of "Wallet Ninja."

8.      Defendants are known to advertise, offer for sale, and sell the Wallet Ninja at brick and mortar stores located throughout the Commonwealth of Massachusetts including, but not limited to, Staples, Office Depot, Walgreens and Walmart.

9.      Defendants make the Wallet Ninja available to any person to buy, including to Massachusetts residents, at these stores and on numerous online shopping platforms including Amazon.com, Walmart.com, Staples.com, Walgreens.com, and Office Depot.

## CAFFEINATE'S PATENT PORTFOLIO

10.     Caffeinate owns two issued patents and one pending patent application covering its designs in its PocketMonkey® tool.  The PocketMonkey is a flat, multi-purpose tool, which is the size of a credit card.

11.     The PocketMonkey was invented by Nathan Barr, President and Founder of Caffeinate.  The PocketMonkey has 12 tools as part of its design.  They are: (1) a bottle opener; (2) a flat screwdriver; (3) a Phillips screwdriver; (4) a micro screwdriver; (5) a phone kickstand; (6) a set of 6 hex wrenches; (7) a fruit peeler; (8) a door latch slip; (9) an earbud cord wrap; (10) a letter opener; (11) a ruler; and (12) a straight edge.

12.     When Barr initially sought to design a multipurpose pocket tool that would fit comfortably in a wallet, he encountered many design challenges.  To his knowledge, there were no multi-purpose tools that were as thin as a credit card.  On the one hand, the design had to be strong enough to function as a tool.  For example, the screwdriver portion had to be able to withstand the torque required to insert or remove a screw.  The hex wrenches had to have sufficient structural integrity such that they could insert or remove a hex bolt.

13.     On the other hand, the design also had to be thin enough to fit in a wallet.  Barr wanted the whole tool to be about the size of a credit card in all dimensions.  In addition, the features had to be precise.  For example, the eye glass screwdriver and the Phillips screwdriver required precision cuts within the body of the multifunctional tool.

14.     When Barr was working on various versions of the multifunctional tool, he relied upon engineering principles to perfect the tools that are part of the PocketMonkey.

15.     After making approximately one hundred revisions of the multifunctional tool, Barr settled on the design that ultimately became the PocketMonkey.

16.     Barr initially applied for a patent on the PocketMonkey design on November 28, 2012.  That application matured into United States Patent No. 9,302,383 entitled "Utility Tool Device and Related Methods and Systems" ("the '383 patent") on April 5, 2016.  A true and accurate copy of the '383 patent is attached hereto as Exhibit A.

17.     On February 19, 2016, Caffeinate filed a continuation of the '383 Patent, entitled "Utility Tool Device," which was published as U.S. Patent Publication No. 2016/0176034 on June 23, 2016.  ("the '034 patent pub.").  This patent application is currently pending before the United States Patent and Trademark Office ("USPTO").  A true and accurate copy of the '034 patent pub. is attached hereto as Exhibit B.

18.     On March 15, 2013, Caffeinate applied for a design patent covering the novel design features of the PocketMonkey.  On June 17, 2014, the USPTO issued United States Patent No. D707,091 entitled "Utility Tool," ("the D'091 patent").  A true and accurate copy of the D'091 patent is attached hereto as Exhibit C.

19.     The 'D'091 patent, the '383 patent, and the '034 patent pub. are assigned to Caffeinate, which owns the full rights, title, and interest in these pieces of intellectual property.

20.     The D'091 patent and the '383 patent have not expired and are in full force and effect.

21.     Pursuant to 35 U.S.C. § 282, the D'091 patent, the '383 patent, and all of their respective claims are presumed valid.

22.     Caffeinate marks its utility tools with notice information regarding its patents.

## INITIAL MEETING BETWEEN THE PARTIES

23.     On or about January 28, 2013, Nathan Barr, CEO of Caffeinate attended a wholesale products and innovative designs tradeshow called NY NOW Market.  He set up a

booth at the NY NOW Market tradeshow so that he could display, and hopefully sell, his newly designed PocketMonkey.

24.     At some point during the tradeshow, Shlaferman approached Barr, who was working Caffeinate's booth, and asked questions about the PocketMonkey.  The discussion originally began as an inquiry into the features of the PocketMonkey.  At some point, Shlaferman offered to help Barr get the PocketMonkey into the sales channels at all of the major big box stores.

25.     The two met later that evening at Barr's hotel, The Yotel, to further discuss Shlaferman's offer.  During that meeting, Shlaferman stated that he would require a license to Caffeinate's intellectual property in order for him to assist in opening sales channels into major big box stores.  Shlaferman's licensing terms essentially required Barr to relinquish all of his rights and control in the intellectual property underlying the PocketMonkey.  Shlaferman tried to convince Barr that he would not succeed without him.

26.     During those discussions, Barr notified Shlaferman that his utility tool designs were patent pending.

27.     On or about February 2, 2013, Barr received an email purportedly sent from Shlaferman, wherein Shlaferman stated: "You've heard everything I've had to say and I hope you realize my credibility. Please try to get an answer for me in the next days if possible. Think long term. We are not building a product we are building a company and you need a partner who is fully capable on all ends strategically, creatively, and technically. I am your one stop shop. This is what you need even if you don't realize it yet. Trust me to do this for you and I will take you and your product where you've never dreamed of. I want a long term relationship where we can continue pumping out products and get into a cycle with these stores with your brand where we

can predict their exact ordering schedule. With my guidance and your ingenuity we can make a shitload of money. I take that back, we WILL make a shitload of money. Just give me the green light and let's work." A true and accurate copy of an email sent from alex@vantetoys.com to nate@caffeinatelabs.com dated February 2, 2013 is attached hereto as Exhibit D.

28.     In an email dated February 6, 2013, Barr rejected Shlaferman's offer, again reiterating that his designs were patent pending.  Specifically, Barr stated: "As we talked about, I think this product has a very strong patent position and doesn't necessitate taking shortcuts to ensure beating out the competition. I have made it very clear in the market that this is patent pending." A true and accurate copy of the February 6, 2013 email from Barr to Shlaferman is attached hereto as Exhibit E.

29.     Not deterred, Shlaferman continued to try to persuade Barr to enter into a business relationship with respect to the manufacturing, design, and sales of the technology embodied in the D'091 and '383 patents.  Specifically, on or about February 28, 2013, Shlaferman sent an email to Barr acknowledging Barr's rights and pleading: "Consider this. I'll give you a check [for] 20 grand which is the guarantee for the first $200k in sales. It's yours to do as you please. All I'm asking for are the full rights to distribute your item, the use of the name PocketMonkey and the use of the design. I will give you a 10% royalty on lifetime sales. I just want this deal to happen now. Truly Yours, Alex Shlaferman |www.vantetoys.com|# 718 332 5584|fax718 568 0258  Like us on Facebook! www.facebook.com/VanteToys." A true and accurate copy of the February 28, 2013 email from Shlaferman to Barr is attached hereto as Exhibit F.

30.     On or about March 1, 2013, Barr sent an email rejecting Shlaferman's proposed terms for at least two reasons: (1) the royalty rate of 10% was too low; and (2) he had potential

business partners offering better terms. A true and accurateaccurate copy of the March 1, 2013 email from Barr to Shlaferman is attached hereto as Exhibit G.

31.     It subsequently appeared that, after Barr rejected Shlaferman's proposed terms for doing business together, Shlaferman substantially copied Barr's design and features, developing an infringing tool which ultimately became known as and sold under the name of the Wallet Ninja.

32.     Further evidencing Defendants' desire to simply copy Plaintiff's designs and to palm-off of Plaintiff's ingenuity and inventiveness, during the discussions between Barr and Shlaferman, Barr told Shlaferman that he was also developing a credit card-sized pocketknife which Barr told him he called Knife Ninja. When Barr learned that Defendants had released a knock-off version of his PocketMonkey under the name "Wallet Ninja," he recognized the need to distinguish his products and changed the name of his pocketknife to Wildcard.

## THE ACCUSED PRODUCT

33.     The Wallet Ninja is a credit-card sized, multifunctional tool. On its packaging, it purports to be the "World's First 100% Flat Multi-Tool," even though Defendants know this statement is false because the PocketMonkey was patent-pending and offered for sale to the public before the infringing Wallet Ninja was developed or sold.

34.     The Wallet Ninja claims to have nearly identical features as the PocketMonkey. Specifically, it has: (1) a bottle opener; (2) a flat screwdriver; (3) a Phillips screwdriver; (4) a micro screwdriver; (5) a cellphone kickstand; (6) a set of 6 hex wrenches; (7) a fruit peeler; (8) a letter opener; (9) a ruler; and (10) a straight edge. Of note, these feautures do not have the design and craftsmanship of the PocketMonkey, which has tended to erode consumer confidence in the PocketMonkey.

35.     The Wallet Ninja also copied the identical thickness and approach to making such a thin tool, which at the time was novel.

36.     Even though Shlaferman knew that Barr had applied for patent protection for his PocketMonkey designs and functionality, he nonetheless applied for a design patent application covering the Wallet Ninja on or about February 26, 2014.  Shlaferman's filing date for his patent application was more than a year after he first saw the PocketMonkey for sale at the NY NOW event and learned of the pending patent(s).

37.     When Shlaferman applied for a patent on the design of the Wallet Ninja, he did not disclose his knowledge of the PocketMonkey as a relevant piece of prior art to the USPTO as is required by the rules of disclosure, candor, and good faith that govern the process of applying for a patent.  The rules of candor before the USPTO require all inventors and their attorneys to disclose all known prior art to the Patent Office.  *See* 37 C.F.R. § 1.56.

38.     Defendants currently sell the Wallet Ninja in numerous online and brick and mortar stores throughout the Commonwealth and other markets.  The Wallet Ninja is sold in the same streams of commerce as the PocketMonkey.  In several instances, stores within the Commonwealth sell both the PocketMonkey and the Wallet Ninja.

39.     The PocketMonkey is made in the United States, whereas The Wallet Ninja is made in China.  Accordingly, the Wallet Ninja is usually available at a lower price than the PocketMonkey.

40.     Plaintiff purchased a Wallet Ninja in an Office Depot store located in Marlborough, Massachusetts in August of 2016.  Hight Decl., ¶ 3.  Additionally, Caffeinate bought a Wallet Ninja from an online retailer and had it shipped to Massachusetts. Barr Decl., ¶ 13.

### DEFENDANTS' MEDIA CAMPAIGN ADVERTISING WALLET NINJA

41.     On information and belief, one or both Defendants operate and control a
Facebook page entitled "The Xander Experience."  The Xander Experience Facebook page is
used, among other things, to market, advertise, promote and comment on the Wallet Ninja
product.

42.     In addition, Shlaferman has been interviewed numerous times regarding   the
purported innovations embodied within the Wallet Ninja which he claims as his own.  These
interviews, some of which are discussed below, have been broadcast worldwide in video and
print format.

43.     Beginning as early as August of 2013, Defendants embarked on a media
campaign replete with knowingly false and misleading statements about the origin of the design
for a flat, multipurpose tool.  In August of 2013, Shlaferman was interviewed on the Howard
Stern show ("Howard Stern interview").  See Barr Decl., ¶ 7; *See also*
https://www.youtube.com/watch?v=zjrAwNwJQYQ

44.     During the Howard Stern interview, Shlaferman demonstrated the Ninja product
for Mr. Stern and a large audience viewing the show live.  See Barr Decl., ¶ 8.

45.     The Howard Stern interview has been further broadcast via live television and
web-archives such as YouTube.

46.     During the Howard Stern interview, Shlaferman evidenced an understanding of
intellectual property rights of others when he discussed the Swiss Army Knife trademark and
acknowledged that he could not characterize the Wallet Ninja as a type of Swiss Army Knife
because that term is trademarked.  See Barr Decl., ¶ 8.

47.    Despite his basic understanding of trademark law, Shlaferman took credit during the Howard Stern interview for designing the multi-purpose, flat tool he called Wallet Ninja, when he knew that, in fact, Nate Barr was the original designer and inventor of a multi-purpose flat tool called PocketMonkey that Shlaferman had substantially copied.  See Barr Decl., ¶ 9.

48.    These blatantly false claims of origin continued into the following year.  For example, in an October 22, 2014 interview, when asked "How did you come up with the idea for the Wallet Ninja?" Shlaferman responded: "Out of a need to create a multi tool you could have with you at all times without actually needing to take something extra with you". A true and accurate copy of this interview can be viewed at http://nextshark.com/20-year-old-entrepreneur-is-so-successful-he-has-his-own-factory-in-china/

49.    Shlaferman made the aforesaid statement with knowledge that Barr had already designed and applied for patent protection for the PocketMonkey nearly two years prior to making that statement.

50.    Two days later, on October 24, 2014, Bloomberg aired an interview with Shlaferman during which he again discussed his purported design of the Wallet Ninja.  See Barr Decl., ¶ 3.  During that interview, Shlaferman stated that he had launched his Wallet Ninja product sometime around October of 2013, which is nearly a year after the priority date for the '383 patent.  See Barr Decl., ¶ 4.

51.    Shlaferman also stated "I'm like vicious," when describing how he had earned $10 million in less than a year from sales of the Wallet Ninja.  *Id.* at ¶ 5.  In addition, Shlaferman stated that he had been selling the Wallet Ninja in Walmart and Pet Boys.

52.    During this same timeframe, Plaintifff's patent applications for the deisgn and utility of the PocketMonkey.  Plaintiff filed for protection of the utility of the PocketMonkey

design on November 28, 2012, nearly a year before Defendants' launch of Wallet Ninja.  The '383 patent application was published on May 29, 2014.  Defendants claim to have made more than $10 million in sales from the Wallet Ninja between October 2013 and October 2014.

53.     Defendants were on notice of Plaintiff's pending patent rights and therefore are liable to Plaintitff for lost profits or a reasonable royalty for all sales of the Wallet Ninja occurring after May 29, 2014.

54.     Defendants are additionally liable to Plaintiff for a reasonable royalty or lost profits for all sales of the Wallet Ninja that occurred after June 17, 2014, which is the issue date of the D'091 patent.

## DEFENDANTS DELIBERATELY UNDERCUT PRICING FOR POCKETMONKEY

55.     The PocketMonkey was first sold to the public in November of 2012, which was nearly a year before Defendants began selling their infringing Wallet Ninja.  As such, Caffeinate developed a market and a demand for a flat, multipurpose tool.  Defendants avoided the tie and financial investment necessary to develop that market and instead entered the game once the market had been developed.  In doing so, they capitalized on Plaintiffs' design and investment by diverting sales that would otherwise have gone to Caffeinate.

56.     PocketMonkey is made in the United States, and is advertised accordingly.

57.     The Wallet Ninja is made in China and imported into the United States.

58.     In the Howard Stern interview Shlaferman stated "America sucks for consumer goods. … The stuff you can do there [China] in a week, here [in the US] takes months." Shlaferman also discussed how much cheaper it is to manufacture in China as compared with the United States.  See Barr Decl., ¶ 10.

59.     Shlaferman also touted the advantages of manufacturing in China in an interview with National Public Radio's Kai Ryssdal on October 28, 2014.  See Barr Decl., ¶ 11; *See also* http://www.marketplace.org/2014/10/28/business/21-year-old-who-owns-factory-china

60.     Based on his conduct, it is clear that Shlaferman purposefully set out to disparage the PocketMonkey and undercut the pricing of the PocketMonkey as a means of diverting sales of the PocketMonkey toward the Wallet Ninja.

## DEFENANTS' DISPARAGEMENT CAMPAIGN AGAINST POCKETMONKEY

61.     During the Howard Stern interview, Shlaferman discussed a Facebook page he operates under the pseudonym Alex Xander called The Xander Experience.

62.     Shlaferman has used the Xander Experience Facebook page, to among other things, advertise impromptu parties he hosts.  See Barr Decl., ¶ 12.  One such party, for example, occurred on the Manhattan Bridge.  *Id.*  The Manhattan Bridge party drew more than 1000 party goers and resulted in Shlaferman being arrested.  *Id.*

63.     Shlaferman has also used the Xander Experience Facebook page to disparage, libel, and make false and distorted claims about the PocketMonkey.

64.     In November of 2014, Shlaferman asked thousands of his Facebook followers to disparage Caffeinate's PocketMonkey tool by posting his request on The Xander Experience Facebook page.  Specifically, Shlaferman posted "Wow I feel flattered that I was knocked off so quickly with some garbage. I really need your guys help. After 6 months of development, sweat, passion and tears, ThinkGeek needs to know this is not right. Please click on http://www.thinkgeek.com/product/18c2/ And comment I prefer a Wallet Ninja http://www.thinkgeek.com/product/1708/ Or anything of that variation. It would mean a huge amount to me. Thank you."  (Xander Experience Disparagement Request").  A true and accurate

copy of the November 30, 2014 quote from The Xander Experience Facebook page is attached hereto as Exhibit H.

65.     The link in the Xander Experience Disparagement Request led directly to an advertisement of the PocketMonkey on a website known as ThinkGeek.

66.     Many of Defendants' follower's heeded the Xander Experience Disparagement Request and posted disparaging comments about the PocketMonkey online.  The majority of the disparaging comments were made on November 30, 2014, the same date as the Xander Experience Disparagement Request was made.  A true and accurate copy of this thread is attached hereto as Exhibit I.

67.     Those disparaging posts appeared on the Think Geek website as well as the Xander Experience Facebook page.

68.     On information and belief, customers, suppliers and other business contacts of Caffeinate saw those disparaging and untrue posts.

69.     Defendants knew at the time they made the Xander Experience Disparagement Request that Nate Barr was the original inventor of the PocketMonkey, a flat, multipurpose tool, which is the size of a credit card, and that Barr's designs predated any designs they had for the Wallet Ninja by a substantial amount of time.  They therefore knew that their claims to be "first" and their assertions that they were "knocked off so quickly with some garbage" were false, misleading, and likely to cause economic injury to Caffeinate.

## NOTICE OF INFRINGEMENT AND UNFAIR BUSINESS PRACTICES

70.     On or about December 21, 2015, Caffeinate sent a letter to the registered agent for Vante Inc.  In that letter, Caffeinate provided written notice to Vante that the USPTO had allowed the claims in the '383 patent.  ("First Notice").  The First Notice was sent via certified

mail, return receipt requested, to Vante's agent of record as listed on the New York Secretary of

State's website.  A true and accurate copy of the December 21, 2015 letter is attached hereto as

Exhibit J.

71.    In addition, the First Notice also notified Vante of its unfair business practices

under both state and federal law with respect to the unauthorized copying of the PocketMonkey

designs, the disparagement of PocketMonkey, and the false and misleading claims that

Caffeinate copied Defendants' designs, when exactly the opposite was true.

72.    Although Caffeinate had addressed the First Notice to Vante's registered agent, an

entity who under law is required to be available to receive mail delivered via the U.S. Post

Office, the USPS was unable to deliver the First Notice after several failed attempts.

73.    The First Notice was returned to Caffeinate's counsel sometime on or about

February 10, 2016.  The front of the envelope indicates that the USPS made at least two attempts

to deliver the First Notice.  The envelope also indicates that the address for Vante's registered

agent had a door, but no doorbell.  The First Notice was returned with a sticker, which states

"Return to Sender[.] Unclaimed[.] Unable to Forward[.] Return to Sender[.]" A true and accurate

copy of the unopened, undelivered First Notice is attached hereto as Exhibit K.

74.    On or about February 22, 2016, Caffeinate's counsel sent an email, attaching the

December 21, 2015 letter, to Vante and to Shlaferman at the following addresses:

alex@vantetoys.com and vantetoys@gmail.com ("Second Notice").  A true and accurate copy of

the February 22, 2016 email to Defendants is attached hereto as Exhibit L.

75.    On or about March 2, 2016, Caffeinate attempted for a third time to provide

notice of Defendants' infringement and unfair business practices ("Third Notice").  This time

Caffeinate sent a letter to: 1733 Sheepshead Bay Road Suite 32, Brooklyn, NY 11235, which is

the address Defendants provided to the USPTO on their trademark application for the Wallet Ninja mark.  A true and accurate copy of the March 2, 2016 letter is attached hereto as Exhibit M.

76.     On March 4, 2016, Vante's attorney acknowledged receipt of the Second Notice. In his email, Vante's counsel stated that he was reviewing the Second Notice and he would respond in due course.

77.     To date, Defendants have not provided any substantive response to the First Notice, the Second Notice, or the Third Notice.

78.     Vante's failure to provide a valid address for receipt of business mail harmed Caffeinate because, once an infringer is put on notice, s/he is subject to willful damages if the infringement continues after the notice date.  By effectively dodging notice by failing to provide a valid mailing address for receipt of notice, Defendants were able to move the notice date for purposes of calculating willful damages.

## INFRINGEMENT OF THE '383 PATENT

79.     Rather than innovate on their own, Defendants copied Caffeinate's patented designs for its flat, multifunctional pocket tool as embodied in the '383 patent.

80.     Defendants do not have permission or any other lawful right to use Caffeinate's inventions as disclosed in the '383 patent or in its child, the '034 patent pub.

81.     The following exemplary claim chart, created based upon one of many online advertisements for the Wallet Ninja, shows how the Wallet Ninja infringes claim 1 of the '383 patent.  A true and accurate copy of an advertisement for the Wallet Ninja, appearing at https://www.vat19.com/item/wallet-ninja-multi-tool is attached hereto as Exhibit N.

82.     This claim chart is based on preliminary analysis and may be amended or supplemented after further investigation and discovery in this action.  This claim chart is for notice purposes under Fed. R. Civ. P. 8 and 12.

| Claim Element (Claim 1 of '383 patent) | Infringing Feature of Accused Product |
|---|---|
| A device, comprising:. | |
| a substantially flat body comprising two or more tools; | "This perfectly flat multi-tool packs six wrenches, four screwdrivers, two rulers, a cellphone stand, a bottle opener, a can opener, a letter opener, a box cutter, and a fruit peeler into a single piece of steel the size of a credit card."  Ex. O, p.1. |
| wherein the two or more tools are formed in or on the body by one or more of cutouts, apertures, contours and inscriptions; | *See* image Ex. O, p. 3 showing two or more tools formed in or on the body by one of more cutouts, apertures, contours, and inscriptions. *See also* image Ex. O, pp. 4, 5, 6, 7. |
| wherein the body further comprises an undulating curvilinear elongate aperture passing therethrough, the undulating curvilinear elongated aperture being approximately 53.98 mm long and configured to accept and frictionally engage with an approximately credit card-sized supporting member: | "With the help of a credit card, you can transform the Wallet Ninja into a smartphone stand." Ex. O, p. 6; *see also* image Ex. O, p. 6. |

| | |
|---|---|
| and wherein the flat body is formed of a heat treated metal. | "Material: 4X heat treated steel"  Ex. O, p. 2 |

## INFRINGEMENT OF THE D'091 PATENT

83.     Rather than innovate on its own, Defendants copied Caffeinate's patented designs for its flat, multifunctional pocket tool as embodied in the D'091 patent.

84.     Defendants do not have permission to use Caffeinate's inventions as disclosed in the D'091 patent.

85.     The exemplary claim chart below shows how the Wallet Ninja infringes claim 1 of the D'091 patent.

86.     As can be seen from the claim chart below, an ordinary observer would think that the accused design is substantially the same as the patented design when the two designs are compared to one another.  This is particularly so because the PocketMonkey was the first tool of its kind, *i.e.*, a truly credit card sized, in all dimensions, multifunctional tool, to hit the consumer market.

87.     Barr spent a considerable amount of time designing the look of the PocketMoney. In his final design, he was able to incorporate twelve tools into the PocketMonkey.  Of those twelve tools, Defendants infringing product copies eight of them.

88.     This claim chart is based on preliminary analysis and may be amended or supplemented after further investigation and discovery in this action. This claim chart is for notice purposes under Fed. R. Civ. P. 8 and 12.

| Claim Element of D'091 patent | Infringing Device |
|---|---|
|  |  |

**COUNT ONE**
**(Infringement of the '383 Patent)**
**(Against Both Defendants)**

89.     Caffeinate re-alleges and incorporates by reference all of the allegations in paragraphs 1 through 88 as if fully set forth herein.

90.     Defendants, jointly or severally, have been and are still infringing one or more claims of the '383 patent by manufacturing, using, selling, importing, or offering for sale the Wallet Ninja within the United States in violation of 35 U.S.C. § 271,

91.     Defendants had actual notice of the pending patents that ultimately issued as the '383 patent at least as early as February 6, 2013.

92.     Defendants had constructive notice of the '383 patent at least as early as April 5, 2016 because Caffeinate marks its Pocket Monkey products with patent notices.

93.     Defendants had actual notice of the '383 patent at least as early as February 22, 2016.

94.     Defendants have profited and continue to profit from their manufacture, use, sale, offers to sell, and importation of the Wallet Ninja.

95.     Defendants' infringement of the '383 patent is wanton,willful, and deliberate.

96.     Caffeinate has suffered and continues to suffer damages and irreparable harm because of Defendants' infringement of the '383 patent.

## COUNT TWO
### (Infringement of the D'091 Patent)
### (Against Both Defendants)

97.     Caffeinate re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants, jointly and severally, have been and are still infringing one or more claims of the D'091 patent by manufacturing, using, selling, importing, or offering for sale the Wallet Ninja within the United States in violation of 35 U.S.C. § 271,

99.     Defendants had actual notice of the pending patents that ultimately issued as the D'091 patent at least as early as February 6, 2013.

100.    Defendants had constructive notice of the D'091 patent at least as early as June 17, 2014 because Caffeinate marks its Pocket Monkey products with patent notices.

101.    Defendants had actual notice of the D'091 patent at least as early as February 22, 2016.

102.    Defendants have profited and continue to profit from their manufacture, use, sale, offers to sell, and importation of the Wallet Ninja.

103.    Defendants' infringement of the D'091 patent is wanton, willful, and deliberate.

104.    Caffeinate has suffered and continues to suffer damages and irreparable harm because of Defendants' infringement of the D'091 patent.

**COUNT THREE**
**(Unfair Business Practices – Section 43(a) of the Lanham Act 15 U.S.C § 1125)**
**(Against Both Defendants)**

105.     Caffeinate re-alleges and incorporates by reference all of the allegations in paragraphs 1 through 104 as though fully set forth herein.

106.     Defendants, jointly and severally, have been and are still committing unfair business practices in violation of  in violation of 15 U.S.C. § 1125,  the Lanham Act.

107.     Defendants' actions include, without limitation, using in commerce, in connection with goods or services false designations of origin, false or misleading descriptions of fact, and/or false or misleading representation of fact, which have caused and continue to cause confusion and mistake to the general public, and have deceived and continue to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or their goods, services, or commercial activities by another person.

108.     In addition, Defendants have in the past and continue to presently: misrepresent the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, in commercial advertising or promotions.

109.     The above-described acts and practices by Defendants have and are likely to continue to purposefully mislead or deceive the general public and therefore constitute unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

110.     Defendants acted willfully and intentionally in claiming to be the world's first flat multipurpose tool, in disparaging the PocketMonkey, in enlisting their customers to disparage the PocketMonkey, in falsely claiming that Caffeinate copied their design for a multipurpose tool, when they knew the opposite was true, among other things.

111.    The unlawful and fraudulent business practices of Defendants, as detailed throughout this complaint, present a continuing threat to, and are intended to deceive members of the public, in that Defendants continue to promote the Wallet Ninja by trading on the goodwill of PocketMonkey, which was in fact developed, patented, and sold long before the Pocket Ninja was purportedly developed, marketed, or sold.

112.    Defendants knew of Caffeinate's designs and patent pending status when they purported to invent the Wallet Ninja.  In fact, Defendants had discussed creating a partnership with Caffeinate and/or licensing Caffeinate's intellectual property for a multipurpose tool.  When Caffeinate rejected Defendants' offers to license or partner, Defendants wrongfully misappropriated Caffeinate's proprietary intellectual property for themselves.

113.    In doing so, Defendants obviated the need to invest their own time and money to develop a multipurpose tool of their own.  Instead, Defendants reaped the monetary benefits of selling the infringing Wallet Ninja without having invested the time, effort, ingenuity and money required to design a functioning, low profile, multipurpose pocket tool.

114.    Defendants created and/or seized opportunities to publicly disparage the PocketMonkey and to claim that they were in fact the first to invent a multipurpose pocket tool.

115.    Caffeinate has been and continues to be irreparably harmed by Defendants' conduct; and Caffeinate lacks an adequate remedy at law to prevent such  ongoing harm and damage to its' goodwill and reputation as well as that of the PocketMonkey.

116.    Defendants by their own admission have profited from their false and misleading advertising and unfair business practices.

117.    Caffeinate has sustained monetary damages as a result of Defendants' false and misleading advertising and unfair business practices in an amount to be proven at trial.

118.     Because Defendants' actions have been willful, Caffeinate is entitled to recover

treble its actual damages or Defendants' profits, whichever is greater, and to an award of costs,

and this being an exceptional case, reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

119.     As a direct and proximate result of Defendants' wrongful conduct, Caffeinate has

been injured in fact and has lost money and profits.  Such harm will continue unless Defendants'

acts are enjoined by this Court.  Caffeinate has no adequate remedy at law for Defendants'

continuing violation of its rights.

## COUNT FOUR
### (Unfair Business Practices in Violation of Mass. G.L. Ch. 93A)
### (Against Both Defendants)

120.     Caffeinate re-alleges and incorporates by reference all of the allegations in

paragraphs 1 through 119 as if fully set forth herein.

121.     Defendants, jointly and severally, have been and are still committing unfair and

deceptive business practices in violation of the laws of the Commonwealth and specifically in

violation of Mass. G.L. Ch. 93A.

122.     Defendantswere on notice of Caffeinate's claims arising out of their conduct in

violation of Mass. G.L. Ch. 93A at least as early as February 22, 2016.

123.     Defendants failed to respond to Caffeinate's demands made pursuant to Mass.

G.L. Ch. 93A.

124.     Defendants' actions include, without limitation, using in commerce, in connection

with goods or services, false designations of origin, false or misleading descriptions of fact,

and/or false or misleading representations of fact, which have caused and continue to cause

confusion, mistake, and have deceived and continue to deceive consumers and the public as to

the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of their goods, services, or commercial activities by another person.

125.    In addition, Defendants have in the past and continue to presently: misrepresent the nature, characteristics, qualities, or geographic origin of their goods, services, or commercial activities, in commercial advertising or promotion.

126.    The above-described acts and practices by Defendants are likely to mislead or deceive the general public and therefore constitute unfair competition under Mass. G.L. Ch. 93A.

127.    Defendants acted willfully, knowingly and intentionally in claiming to be the world's first multipurpose tool, in disparaging the PocketMonkey, in actively enlisting their customers to disparage the PocketMonkey, in falsely claiming that Caffeinate copied their design for a multipurpose tool, when they knew the opposite was true, among other things.

128.    The unlawful and fraudulent business practices of Defendants, as detailed throughout this complaint, present a continuing threat to, and are meant to deceive members of the public, in that Defendants continue to promote the Wallet Ninja by trading on the goodwill of PocketMonkey, which was in fact the developed, patented, and sold by Plaintiffs long before the Pocket Ninja was purportedly invented, marketed, or sold.

129.    Defendants knew of Caffeinate's designs and patent pending status when they purported to invent the Wallet Ninja.  In fact, Defendants had proposedcreating a partnership with Caffeinate and/or licensing Caffeinate's intellectual property for a multipurpose tool.  When Caffeinate rejected Defendants' offers to license or partner, Defendants wrongfully misappropriated Caffeinate's proprietary intellectual property for their own gain.

130.    In doing so, Defendants obviated the need to invest their own time and money to develop a multipurpose tool of their own.  Instead, Defendants reaped the monetary benefits of

selling the infringing Wallet Ninja without having invested the time, effort, ingenuity and money required to design a functioning, low profile, multipurpose pocket tool.

131.     Defendants created and/or seized opportunities to publicly disparage the PocketMonkey and to claim that they were in fact the first to invent a multipurpose pocket tool.

132.     Caffeinate has been and continues to be irreparably harmed by Defendants' conduct; and Caffeinate lacks an adequate remedy at law to prevent such ongoing harm and damage to its' goodwill and reputation as well as that of the PocketMonkey.

133.     Defendants have wrongfully gained profits by virtue of their false, deceptive and misleading advertising and unfair business practices.

134.     Caffeinate has sustained monetary damages as a result of Defendants' false, deceptive and misleading advertising and unfair business practices in an amount to be determined at trial.

135.     As a result of Defendants' willful conduct as aforesaid, Caffeinate is entitled to recover punitive damages in an amount double or treble the actual damages assessed or Defendants' profits, whichever is greater, and to an award of costs and reasonable attorneys' fees pursuant to Mass. G.L. Ch. 93A.

136.     As a direct and proximate result of Defendants wrongful conduct and unfair or deceptive acts or practices, Caffeinate has suffered actual damages and has lost money and profits.  Such harm will continue unless Defendants' conduct is enjoined by this Court. Caffeinate has no adequate remedy at law for Defendants' continuing violations of its rights.

## COUNT FIVE
### (Interference with Advantageous Business Relations)
### (Against Both Defendants)

137.     Caffeinate re-alleges and incorporates by reference the allegations in paragraphs 1 through 136 as if fully set forth herein.

138.     By their conduct alleged herein, Defendants have wrongfully interfered with Caffeinate's advantageous business relations with its customers, its suppliers, its resellers, and others with whom Caffeinate does business.  By posting disparaging remarks about Caffeinate's products, proactively encouraging their followers to disparage Caffeinate's products, claiming to manufacture and distribute the world's first 100% flat multi-tool, among other things, Defendants have wrongfully interfered with Caffeinate's business relationships.

139.     Defendants knew that Caffeinate was marketing and selling the PocketMonkey and that Caffeinate enjoyed an economic benefit from those sales.

140.     Defendants knew that Caffeinate had customers and other business relationships with third parties.

141.     Defendants motives were improper, wrongful and unlawful.

142.     Caffeinate lost sales and goodwill in an amount to be determined at trial as a proximate result of Defendants' lies regarding, among other things: (1) who was first to market with a 100% flat multi-tool; (2) who copied whose intellectual property.

## COUNT SIX
### (Commercial Disparagement)
### (Against Both Defendants)

143.     Caffeinate re-alleges and incorporates by reference all of the allegations in paragraphs 1 through 142 as if fully set forth herein.

144.      Defendants are known to have published false statements in the following places: (1) the packaging for their Wallet Ninja tool; (2) on the Xander Experience Facebook page; (3) on the ThinkGeek website; and (4) in interviews in print and video mediums available on the Web.

145.      Defendants' false statements were harmful to Caffeinate and its owner Nathan Barr.

146.      Caffeinate suffered pecuniary loss and loss of its goodwill in an amount to be determined at trial.

147.       Defendants intended to harm Caffeinate by virtue of their false statements.

148.      Defendants knew their statements were false at the time they were made.

149.      Defendants acted with reckless disregard for the truth or falsity of the statements made and described herein.

## COUNT SEVEN
### (Unjust Enrichment)
### (Against Both Defendants)

150.      Caffeinate re-alleges and incorporates by reference all of the allegations in paragraphs 1 through 149 as if fully set forth herein.

151.      As a result of the aforesaid conduct, Defendants have been unjustly enriched to Caffeinate's detriment.  Caffeinate seeks a fullaccounting and disgorgement of all ill-gotten gains and profits resulting from Defendants' inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Caffeinate Labs, Inc., respectfully requests relief as follows:

A.  A declaratory judgment that Vante and/or Shlaferman has infringed one or more of the claims of the asserted patents;

B.  An order for injunctive relief and final judgment preliminarily and permanently enjoining Shlaferman and Vante and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of Caffeinate's asserted patents;

C.  A judgment awarding Caffeinate monetary damages adequate to compensate for Defendants' infringement of Caffeinate's asserted patents, and a reasonable royalty based on Defendants' saes of infringing products, as well as all pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.  A judgment awarding Caffeinate punitive damages including treble damages based on any infringement found to be willful, pursuant to 35 U.S.C. § 284, together with prejudgment interest;

E.  Judgment for actual damages suffered by Caffeinate as a result of Defendants' unlawful conduct, in an amount to be determined at trial, as well as prejudgment interest as authorized by law;

F.  Reasonable funds for corrective advertising;

G.  An accounting of Defendants' profits pursuant to 15 U.S.C. § 1117;

H.  A judgment trebling any damages award pursuant to 15 U.S.C. § 1117;

I.  Punitive damages and injunctive relief pursuant to Mass. G.L. Ch. 93A;

J.  Restitution relief against Defendants and in favor of Caffeinate, including disgorgement of wrongfully obtained profits and other appropriate relief;

K.  Costs of suit and reasonable attorneys' fees; and

L.  Any other relief to which Caffeinate is entitled under any state or federal law.

## DEMAND FOR JURY TRIAL

Caffeinate Labs, Inc. demands a jury trial for all issues so triable.

CAFFEINATE LABS, INC.

By its attorneys,

/s/ *Anne-Marie Dinius*
Anne-Marie Dinius BBO# 647556
amdinius@amdiniuslaw.com
AMDinius Law
101 Great Road, #119
Bedford, MA 01730
(650) 814-0810

Jonathan Braverman
JonathanB@BBB-lawfirm.com
Baker, Braverman & Barbadoro
300 Crown Colony Dr #500
Quincy, MA 02169
(781) 848-9610

Dated: December 7, 2016